# Exhibit B

# Plaintiff's Amended Class Action Complaint

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MILLS CASHWAY PHARMACY, INC., a Louisiana corporation, individually and as the representative of a class of similarly-situated persons, <br><br> Plaintiff, <br><br> v. <br><br> CHANGE HEALTHCARE, INC., eRx Network, LLC, and JOHN DOES 1-5. <br><br> Defendants. | No. 3:24-cv-00978 <br><br> **COMPLAINT-CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Mills Cashway Pharmacy, Inc. ("Plaintiff"), brings this action on behalf of itself and all others similarly situated and, except as to those allegations pertaining to Plaintiff or its attorneys, which are based on personal knowledge, alleges the following upon information and belief against Defendant Change Healthcare Inc. ("Change Healthcare") and eRx Network, LLC ("eRx") (collectively, "Defendants"), after a reasonable investigation by counsel.

### PRELIMINARY STATEMENT

1.  The Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), prohibits sending any "unsolicited advertisement" by fax. 47 U.S.C. § 227 (b)(1)(C).

2.  On September 3, 2020, Plaintiff received an unsolicited advertisement on its fax machine. A redacted, but otherwise true and correct copy of the fax is attached as **Exhibit A**.

3.  The fax was sent "From Change Healthcare." **Exhibit A**. Change Healthcare appears as the sender in the fax header of **Exhibit A**. Under the TCPA, the identity of the sender of a fax must appear in the fax header. *See* 47 U.S.C. 227(d)(1)(B) (identification requirements).

4. Change Healthcare has stated in Interrogatory responses provided under oath that it believes eRx was "involved in sending the fax" attached as **Exhibit A**.

5. **Exhibit A** promotes the sale of Xarelto.

6. Defendants did not have Plaintiff's prior express invitation or permission to send **Exhibit A** to Plaintiff's fax machine.

7. **Exhibit A** has no opt-out notice, so the existence of an "established business relationship" would not justify or support sending an otherwise unsolicited advertisement by fax transmission. 47 U.S.C. § 227(b)(1)(C)(i) and (iii).

8. The TCPA provides a private right of action and statutory damages of $500 for each violation. 47 U.S.C. § 227(b)(3). If the sender willfully or knowingly violated the Act, the Court may increase the award to $1,500 per violation. The Court may also grant injunctive relief.

9. On behalf of itself and the other members of a class of similarly-situated persons and entities, Plaintiff seeks statutory, liquidated damages for each of Defendants' violations of the TCPA during the period commencing four years prior to the filing of this action and continuing until the Court orders notice to the class.

**PARTIES, JURISDICTION, AND VENUE**

10. Plaintiff, Mills Cashway Pharmacy, Inc., is a Louisiana corporation operating a pharmacy in Parks, Louisiana.

11. Defendant Change Healthcare Inc. is a Delaware corporation with its principal place of business located at 424 Church St, #1400, Nashville, TN 37219. Its registered agent in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Its registered agent in Tennessee is CT Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

2

12. On information and belief, UnitedHealth Group Incorporated acquired Change Healthcare in 2022. As a result of that transaction, Change Healthcare is now "wholly owned by UnitedHealth Group and a part of the Optum Insight business segment of UnitedHealthcare Group.

13. On information and belief, Defendant eRx is a Delaware Limited-Liability Company with its principal place of business located at 424 Church Street, Suite 1400, Nashville, TN 37219. eRx is registered to do business as a Foreign Limited Liability Company (LLC) in Tennessee. Its registered agent in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Its Registered Agent in Tennessee is CT Corporation System, 300 Montvue Rd, Knoxville, TN 37919-5546.

14. On information and belief, Defendant eRx is one of Change Healthcare's wholly-owned subsidiaries and is part of the Optum Insight business segment of UnitedHealthcare Group.

15. Defendants John Does 1-5 are persons unknown to Plaintiff who authorized or participated in the sending **Exhibit A** and other unsolicited fax advertisements, or on whose behalf such unlawful faxes were sent.

16. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

17. Personal jurisdiction exists over Change Healthcare in Tennessee because Change Healthcare's principal place of business is located in Nashville, Tennessee, it transacts business in the State, and it committed the tortious acts giving rise to this action in the State by sending unlawful fax advertisements to recipients like Plaintiff.

18. Personal jurisdiction exists over eRx in Tennessee because eRx's principal place of business is located in Nashville, Tennessee, it transacts business in the State, and it committed the

3

tortious acts giving rise to this action in the State by sending unlawful fax advertisements to recipients like Plaintiff.

19. Venue is proper in the Middle District of Tennessee because Defendants are located in the District, transact business in the District and have committed statutory torts within the District.

**FACTS**

20. Plaintiff operates a pharmacy at 1027 Martin Street, Parks, Louisiana.

21. On September 3, 2020, Plaintiff received a fax transmission on its telephone facsimile machine that was connected to its telephone fax number: (337) 845-5199. The facsimile message automatically printed on paper. A redacted copy of the fax Plaintiff received is attached as **Exhibit A**.

22. **Exhibit A**'s header indicates the message was sent by "Change Healthcare." *See* 47 U.S.C. 227(d)(1)(B) (identification requirements).

23. Notwithstanding the fact that Change Healthcare is identified on the fax as the sender, as required by law, Change Healthcare has asserted in Interrogatory responses provided under oath that eRx "is the entity involved in sending the fax" regarding Xarelto, that is attached as **Exhibit A**, and the fax "originated from one of eRx's data centers located in Memphis, Tennessee or Chicago, Illinois."

24. Change Healthcare is a "leading independent healthcare technology company, focused on insights, innovation and accelerating the transformation of the U.S. healthcare system through the power of the Change Healthcare Platform." https://www.changehealthcare.com/about (Aug 8, 2020).

25. On information and belief, eRx provides third-party claims management services to the retail pharmacy industry, including "claims processing and editing, real-time insurance

4

verification, e-prescribing, medical and vaccination claims billing and other services." See https://www.erxnetwork.com/about, an archival copy of the webpage is available at https://web.archive.org/web/20230902000917if_/https://www.erxnetwork.com/.

26.     **Exhibit A** advertises Xarelto.

27.     Xarelto is the brand name of a prescription medication (rivaroxaban) offered by J&J Innovative Medicine (formerly known as Janssen Pharmaceuticals, Inc.) ("J&J") in the United States. See https://www.janssen.com/us/our-products; https://www.xarelto-us.com/.

28.     **Exhibit A** promotes the sale of Xarelto and further urges sales of Xarelto in a "90 Day Supply" which would "Save time" and "Save money."

29.      On information and belief, J&J knew about and consented to the use and sending of the Xarelto advertisement in **Exhibit A**. As reflected on **Exhibit A**, Xarelto is a registered trademark. The trademark owner has an exclusive right to use the mark. Third parties like Defendant cannot use a trademark without the trademark owner's permission. **Exhibit A** is obviously a form letter communication.

30.     **Exhibit A** encourages the recipient to "Call your doctor" to obtain "a 90-day prescription" for Xarelto.

31.     **Exhibit A** encourages the recipient to use the Xarelto.com website for additional information regarding Xarelto.

32.     As such, **Exhibit A** has two calls-to-action, encouraging the recipient to "ask your doctor about a 90-day supply of Xarelto" and encouraging them to use the Xarelto website.

33.     Plaintiff's name and telephone number are the only information unique to Plaintiff printed on **Exhibit A**.

5

34.     **Exhibit A** also contains the name and prescription number of one of Plaintiff's customers. That information is redacted from **Exhibit A** to protect their privacy.

35.     The purpose underlying the transmission of **Exhibit A** is evident from the language of the form, which seeks to sell 90-day supplies of Xarelto to pharmacies, like Plaintiff, and through them to their customers.

36.     Defendants sent **Exhibit A** as a commercial promotion and as an active part of their business, seeking to induce the purchase of a 90-day supply of Xarelto, rather than a 30-day supply or rather than some other medication altogether.

37.     Defendants intended that Plaintiff would influence its customer's future purchasing decisions and encourage the customer to seek a different prescription from their medical doctor.

38.     Defendants did not have Plaintiff's prior express invitation or permission to send any advertising material by fax.

39.     **Exhibit A** states, "Your pharmacist has already determined that your insurance plan will cover a 90-day supply of XARELTO," but Plaintiff had made no such determination.

40.     **Exhibit A** has no opt-out notice, so any "established business relationship" between Plaintiff and Defendant would not justify sending the otherwise unsolicited advertisement in **Exhibit A** to Plaintiff's fax machine. 47 U.S.C. § 227(b)(1)(C)(i) and (iii).

41.     Defendants violated the TCPA by sending **Exhibit A** to Plaintiff's fax machine.

42.     A facsimile transmission can be received only with special equipment connected to a 10-digit telephone/fax number. The recipient pays money to have this capacity.

43.     Fax transmissions are sent between ten-digit numbers assigned by the North American Numbering Plan Administrator ("NANPA")—from one number in the integrated North American Numbering Plan ("NANP") to another NANP number—using the Public Switch

6

Telephone Network ("PSTN") and the ITU T.30 faxing protocol as regulated by the FCC.[1] Each successful fax transmission crosses the public, regulated telephone network and the regular telephone lines.

44. Fax recipients are a captive audience. Fax machines are left on and ready to receive authorized messages.

45. Every unsolicited fax causes harm. Each causes unwarranted wear and tear on the receiving fax machine. Some prevent the receiving machine from sending or receiving an authorized fax. If automatically printed upon receipt, as when Plaintiff received **Exhibit A**, the unsolicited advertisement is printed with the recipient's ink toner and on the recipient's paper. Printed or not, every unsolicited fax imposes an incremental, per-page cost on its recipient. Every unsolicited fax interrupts the recipient's privacy and seclusion, and wastes their valuable time, because one or more individuals must view the faxed message to discern its source, purpose, or nature.

46. Plaintiff uses its fax machine to send and receive urgent, confidential, and private communications. Each message received by fax, including unsolicited advertisements like the one attached as **Exhibit A**, must be reviewed by one or more of Plaintiff's employees.

47. For itself and each class member, Plaintiff seeks statutory, liquidated damages of $500 for each of Defendants' violations of the TCPA within the four years before this action was commenced and continuing until the Court directs notice to the class.

---

[1] NANP numbers are ten-digit numbers consisting of a three-digit Numbering Plan Area code, commonly called an area code, followed by a seven-digit local number.

**CLASS REPRESENTATION ALLEGATIONS**

48. Plaintiff brings this action on behalf of the following class:

> All persons and entities in the United States who were sent one or more faxes by or on behalf of Change Healthcare or eRx on or after August 9, 2020, where the fax contained content promoting, advertising, or encouraging the commercial availability, quality, or purchase of any property, goods, or services, including but not limited to prescription medications, healthcare products, or healthcare services.

49. Excluded from the class are Change Healthcare Inc., eRx Network, LLC and their respective employees, officers, directors, shareholders, and legal representatives. Also excluded is any judge assigned to this action, and the members of his or her immediate family.

50. Plaintiff anticipates modifying the class definition—including proposing subclasses or excluding putative members if appropriate—after discovery about Defendants' fax advertising practices.

51. This action is brought, and may properly be maintained as, a class action under Fed. R. Civ. P. 23. The action satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements because: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representative party will fairly and adequately protect the interests of the class, and (4) the class action is an appropriate method for the fair and efficient adjudication of the controversy. Prosecution of Plaintiff's claims separately from the putative class's claims would create a risk of inconsistent or varied adjudications under Rule 23(b)(1)(A). Common questions of law or fact predominate over any individual questions and class representation is the superior method to adjudicate this controversy under, as required by Rule 23(b)(3).

52. **Numerosity/Impracticality of Joinder:** On information and belief, the class includes more than 40 persons and is so numerous that individual joinder of its members is impracticable.

53. **Exhibit A** is a standardized form, intended to be faxed to many persons and entities.

54. **Exhibit A** is likely one of a family of forms Defendants sent by fax transmission to pharmacies and other health care professionals, faxing unsolicited advertisements through a mechanized or automated system.

55. Plaintiff intends to discover the various form advertisements Defendants sent by fax transmission.

56. Plaintiff does not know the number of class members or their identities, but Plaintiff intends to discover the identities of the class members in Defendant's records or the records of third parties.

57. **Commonality and Predominance:** There is a well-defined community of interest and common questions of law and fact that predominate over any question affecting only individual members of the class. These common legal and factual questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

    a. Whether Change Healthcare used facsimile transmissions to send material advertising the commercial availability or quality of property, goods, or services;

    b. Whether eRx used facsimile transmissions to send material advertising the commercial availability or quality of property, goods, or services;

c. Whether **Exhibit A** — and other, similar documents sent by facsimile transmission—contained "material advertising the commercial availability or quality of property, goods, or services";

d. The manner and method used to compile or identify the targets of the fax advertisements;

e. The equipment and method used to send the faxes;

f. Whether Defendants had "prior express invitation or permission" to fax advertising material;

g. Whether Defendants included on the first page of their fax advertisements a clear and conspicuous opt-out notice including all content required by the TCPA;

h. Whether the Court should award statutory damages to Plaintiff and the other class members;

i. Whether Defendants violated the TCPA or the FCC's regulations knowingly or willfully and, if so, whether the Court should treble the statutory damages; and

j. Whether the Court should enjoin Defendants from faxing advertising material in the future.

58. **Typicality of Claims**: Plaintiff's claims are typical of the claims of the other class members because they were injured by the same wrongful practices. Plaintiff and the other members of the class received unsolicited advertisements by facsimile transmission. If Plaintiff prevails on its claims, then the putative class members will prevail as well.

59. **Adequacy of Representation:** Plaintiff is an adequate representative of the class. Plaintiff's interests do not conflict with the interests of the class. Plaintiff has retained counsel

competent and experienced in complex class action litigation, and TCPA litigation in particular, and Plaintiff intends to vigorously prosecute this action. Plaintiff and its counsel will fairly and adequately protect the interest of members of the class.

60. **Prosecution of Separate Claims Would Yield Inconsistent Results**: Common questions of fact and law predominate. Separate adjudication of class member's claims would yield inconsistent and varying adjudications. Such inconsistent rulings would create incompatible standards for Defendants if or when class members bring additional lawsuits concerning the same or similar unsolicited fax advertisements or if Defendants advertise by fax again in the future.

61. **A Class Action is the Superior Method of Adjudicating the Common Questions of Law or Fact that Predominate over Individual Questions**: A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation would be economically unfeasible and procedurally impracticable. There is no other TCPA lawsuit pending against Defendants. The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Plaintiff perceives no difficulty in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the class would be proper.

### COUNT I
### TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

62. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

63. Plaintiff brings Count I on behalf of itself and a class of similarly-situated persons.

64. Defendants violated 47 U.S.C. § 227, et seq., and the FCC's regulations, by faxing advertisements to Plaintiff and the other class members without their prior express invitation or

permission and, to the extent Defendants contends they faxed any advertisement because of an "established business relationship," by failing to include an opt-out notice on the first page of the advertisement

    65.    The TCPA provides in pertinent part as follows: 47 U.S.C. § 227 (b)(1)(C).

(b)    Restrictions on use of automated telephone equipment

    (1)    Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

\* \* \*

(C)    to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless--

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through--

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution, except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or ….

47 U.S.C. § 227 (b)(1)(C).

66. An "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227(a)(4).

67. Defendants (or someone acting on their behalf) sent **Exhibit A** to Plaintiff's telephone fax number.

68. **Exhibit A** advertises the commercial availability or quality of property, goods, or services, including Xarelto.

69. Defendants did not have Plaintiff's prior express invitation or permission to send **Exhibit A** to Plaintiff's fax machine.

70. **Exhibit A** contains no opt-out notice.

71. The TCPA permits a person to fax an otherwise "unsolicited advertisement" to another person with whom they have an "established business relationship," but only if the first page of the advertisement contains a clear and conspicuous opt-out notice. 47 U.S.C. § 227(b)(2)(D); 47 C.F.R. § 64.1200(a)(4)(iii).

72. The lack of an opt-out notice on **Exhibit A** necessarily means any "established business relationship" between Defendants and any of their intended fax recipients is irrelevant in this case. 47 U.S.C. § 227(b)(1)(C)(i) and (iii).

73. Facsimile advertising imposes burdens on unwilling recipients that are distinct from those imposed by other types of advertising. The content of the required opt-out notice is designed to ensure that the recipients know how to prevent and avoid future fax transmissions of advertising material, and to provide the various cost-free means Congress required to be made available to do

13

so. If senders do not clearly and conspicuously provide the opt-out content to the recipients, then the recipients are unable to avoid the burdens imposed by this form of advertisement.

74. The TCPA is a strict liability statute, so Defendants are liable to Plaintiff and the other class members even if their actions were negligent.

75. Defendants are liable because they sent the faxes, caused the faxes to be sent, participated in the activity giving rise to and/or constituting the violation, the faxes were sent on their behalf, and/or under general principles of vicarious liability applicable under the TCPA, including actual authority, apparent authority, and ratification.

76. Defendants knew or should have known that Plaintiff and the other class members had not expressly invited or given express permission to receive Defendants' advertising material by fax.

77. Defendants' actions caused harm. Defendants' junk faxes invaded each recipient's privacy and right to seclusion and caused Plaintiff and others to lose paper and toner consumed in printing Defendants' faxes. Moreover, the faxes used Plaintiff's and the class's fax machines, blocked or interfered with the sending and receiving capacity of the machines, increased costs associated with operating and maintaining the fax machines, and otherwise wasted valuable resources. Receiving and reviewing a junk fax wastes the recipient's valuable time.

78. The TCPA provides a private right of action as follows:

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State--

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3).

79. For itself and every other member of the class, Plaintiff seeks an award of $500 in statutory, liquidated damages for each of Defendants' violations of the TCPA. Plaintiff does not seek to recover for actual monetary loss.

80. Further, Plaintiff requests trebling if the Court determines, in its discretion, that Defendants' violations were knowing or willful. 47 U.S.C. § 227(b)(3).

WHEREFORE, Plaintiff, individually and on behalf of all others similarly-situated, demands judgment in their favor and against Defendants, jointly and severally, as follows:

    A. That the Court adjudge and decree that the present case may be properly maintained as a class action, certify a class, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

    B. That the Court award $500.00 in statutory damages for each of Defendants' violations of the TCPA or the FCC's regulations thereunder;

    C. That the Court treble the statutory damages to $1,500 per violation if it finds that Defendants violated the TCPA or the FCC's regulations knowingly or willfully;

    D. That the Court enter an injunction prohibiting Defendants from sending advertising material by fax without first demonstrating that it has obtained prior express invitation or permission from the anticipated target of the fax transmission or, for any advertisement sent by fax based on an "established business relationship," that the first page of the advertisement includes a compliant, clear and conspicuous opt-out notice; and

E. That the Court award costs and such further relief as the Court may deem just and proper.

Dated: September 30, 2025.

Respectfully submitted,

MILLS CASHWAY PHARMACY, INC., individually and as the representative of a class of similarly-situated persons,

By:     /s/ *Phillip A. Bock*
              One of its attorneys

David L. Cooper BPR No. 011445
The Law Office of David L. Cooper, P.C.
208 Third Avenue, North
Suite 300
Nashville, TN 37201
Telephone: 615-256-1008
Email: dcooper@cooperlawfirm.com

Phillip A. Bock (*pro hac vice*)
David M. Oppenheim (*pro hac vice*)
Jeffrey A. Berman (*pro hac vice*)
Bock Hatch & Oppenheim, LLC
203 N. La Salle St., Ste. 2100
Chicago, IL 60601
Telephone: 312-658-5500
Email: service@classlawyers.com

# EXHIBIT A

# Ask Your Doctor About a 90-Day Supply of XARELTO® (rivaroxaban)



**REDACTED**    MILLS CASHWAY PHARMACY 337-845-5199

**Save time:** Getting a 90-day supply can mean fewer trips to the pharmacy for this prescription.



**Save money:** Depending on your plan coverage, you may also save money on your total co-pay for this prescription. Please call your drug prescription plan for details on co-pay costs.



***Am I approved for a 90-day prescription?*** Your pharmacist has already determined that your insurance plan will cover a 90-day supply of XARELTO®.



**Call your doctor** to find out if a 90-day prescription is right for you.

This information is specific to the XARELTO® prescription you are filling today. You should speak to your doctor if you have questions about your other medications.

**For more information please visit Xarelto.com**

## WHAT IS XARELTO®?
XARELTO® is a prescription medicine used to:
- reduce the risk of stroke and blood clots in people who have a medical condition called atrial fibrillation that is not caused by a heart valve problem. With atrial fibrillation, part of the heart does not beat the way it should. This can lead to the formation of blood clots, which can travel to the brain, causing a stroke, or to other parts of the body
- treat blood clots in the veins of your legs (deep vein thrombosis or DVT) or lungs (pulmonary embolism or PE)
- reduce the risk of blood clots happening again in people who continue to be at risk for DVT or PE after receiving treatment for blood clots for at least 6 months
- help prevent a blood clot in the legs and lungs of people who have just had hip or knee replacement surgery

XARELTO® is also used with low dose aspirin to:
- reduce the risk of serious heart problems, heart attack and stroke in people with coronary artery disease (a condition where the blood supply to the heart is reduced or blocked) or peripheral artery disease (a condition where the blood flow to the legs is reduced)

It is not known if XARELTO® is safe and effective in children.

## IMPORTANT SAFETY INFORMATION
### WHAT IS THE MOST IMPORTANT INFORMATION I SHOULD KNOW ABOUT XARELTO®?
XARELTO® may cause serious side effects, including:
- **Increased risk of blood clots if you stop taking XARELTO®.** People with atrial fibrillation (an irregular heart beat) that is not caused by a heart valve problem (nonvalvular) are at an increased risk of forming a blood clot in the heart, which can travel to the brain, causing a stroke, or to other parts of the body. XARELTO® lowers your chance of having a stroke by helping to prevent clots from forming. If you stop taking XARELTO®, you may have increased risk of forming a clot in your blood.

Do not stop taking XARELTO® without talking to the doctor who prescribes it for you. Stopping XARELTO® increases your risk of having a stroke. If you have to stop taking XARELTO®, your doctor may prescribe another blood thinner medicine to prevent a blood clot from forming.

- **Increased risk of bleeding.** XARELTO® can cause bleeding which can be serious, and may lead to death. This is because XARELTO® is a blood thinner medicine (anticoagulant) that lowers blood clotting. During treatment with XARELTO® you are likely to bruise more easily, and it may take longer for bleeding to stop.

You may have a higher risk of bleeding if you take XARELTO® and take other medicines that increase your risk of bleeding, including:
- Aspirin or aspirin-containing products
- Long-term (chronic) use of non-steroidal anti-inflammatory drugs (NSAIDs)
- Warfarin sodium (Coumadin®, Jantoven®)
- Any medicine that contains heparin
- Clopidogrel (Plavix®)
- Selective serotonin reuptake inhibitors (SSRIs) or serotonin norepinephrine reuptake inhibitors (SNRIs)
- Other medicines to prevent or treat blood clots

Tell your doctor if you take any of these medicines. Ask your doctor or pharmacist if you are not sure if your medicine is one listed above.

Call your doctor or get medical help right away if you develop any of these signs or symptoms of bleeding:
- Unexpected bleeding or bleeding that lasts a long time, such as:
  – Nosebleeds that happen often
  – Unusual bleeding from gums
  – Menstrual bleeding that is heavier than normal, or vaginal bleeding
- Bleeding that is severe or you cannot control

Please see additional Important Safety Information on back.